1
2
3
4
5
6
7                 IN THE UNITED STATES DISTRICT COURT

8            FOR THE NORTHERN DISTRICT OF CALIFORNIA

9
10
11   SHEARWOOD FLEMING,                    No C 05-3564 VRW

12            Petitioner,                  ORDER

13            v

14   ANTHONY KANE,

15            Respondent.

16   _____

17   BOARD OF PAROLE HEARINGS,

18            Real party in interest.

     _____/
19
20            Petitioner Shearwood Fleming, a prisoner at the

21   Correctional Training Facility in Soledad, California, has filed a

22   petition for a writ of habeas corpus under 28 USC § 2254.

23   Petitioner challenges a September 18, 2002 decision by the Board of

24   Prison Terms (merged into the Board of Parole Hearings after the

25   petition was filed) ("Board") denying him parole.  Doc #1.

26   Respondent Anthony Kane filed an answer on March 19, 2007 opposing

27   the issuance of a writ (Doc #21) and petitioner filed a traverse on

28   May 25, 2007 (Doc #28).

United States District Court
For the Northern District of California

1   For the reasons stated herein, the petition for a writ of
2   habeas corpus is hereby DENIED.

3

4                                I

5                                A

6        On March 3, 1981, petitioner pled guilty to second degree
7   murder in superior court in Los Angeles.  He was sentenced to
8   fifteen years to life imprisonment with a two-year enhancement for
9   the use of a firearm during the commission of the crime.  Appx A-I,
10  Ex A at 110; Doc #21, Ex 1.  Petitioner disputes the extent of his
11  responsibility for the homicide underlying his conviction, but he
12  acknowledges the "appropriateness of his conviction" for second
13  degree murder.  See Doc #17 at 2; Doc #16 at 14, fn 11.  Because
14  petitioner was sentenced pursuant to a plea agreement, the
15  underlying facts of the crime were never adjudicated.  These facts
16  play an important role in petitioner's habeas corpus proceedings,
17  however, as the commitment offense played a large role in the
18  Board's decision to deny petitioner parole.

19        Petitioner's version of the facts is as follows:  On
20  August 10, 1980 at approximately 11 pm, petitioner, then twenty
21  years old, met sixteen-year-old Joey Sherrod at a beach in Santa
22  Monica.  Appx A-I, Ex A at 175.  During this encounter, petitioner
23  and Sherrod had a discussion about "how the Mexicans were killing a
24  lot of blacks; about how they shot 'Boo' and 'AJ', and [] about the
25  close encounter [petitioner] had with some Mexicans 4 weeks ago."
26  Id.  According to petitioner, Sherrod mentioned that he wanted to
27  rob "some Mexicans, * * * the same ones that shot Boo and AJ,
28  \\

United States District Court
For the Northern District of California

1  because if they don't give up any money then I blow their heads

2  off."  Id.

3         The duo, in possession of a gun, left the beach and

4  passed through a vacant lot on Santa Monica Avenue, where they saw

5  the two victims, Nazario Garcia and Samuel Trujillo, walking home.

6  Doc #16 at 13.  Petitioner and Sherrod stepped out of the bushes

7  and asked the victims for money.  Appx A-I, Ex A at 175.  The

8  victims "started laughing, and [petitioner] couldn't comprehend

9  what they were saying because they were speaking spanish."  Id.

10        At his initial interview by police on August 13, 1980,

11 petitioner stated that once the victims left, Sherrod discharged

12 the gun at them.  Id.  The gun "suddenly clicked," misfiring, and

13 petitioner started "running for it."  Id.  At this point,

14 petitioner stated that he heard the gun fire, and he "started

15 running back to see what happened."  Id.  He saw one victim, later

16 identified to be Garcia, lying on the ground.  Petitioner stood

17 over Garcia, "feeling sorry," and then heard another "set of

18 shots."  Id.  He saw the second victim, Trujillo, "running for his

19 life."  Appx A-I, Ex A at 176.

20        In his subsequent testimonies before the parole board,

21 however, petitioner changed his story and stated that he was the

22 one who initially held and fired the weapon.  See, e g, Appx A-II

23 at 406 ("when they started laughing, he asked me to shoot and so I

24 pointed the gun up in the air and I didn't know it had a safety

25 mechanism * * * a safety catch on it"); see also id at 644.  After

26 the gun failed to discharge, petitioner testified that: "Joey then

27 snatched the gun from me * * * and shot Mr Garcia in the side as he

28 was running" (Appx A-I, Ex E at 376); Garcia was shot twice in the

United States District Court
For the Northern District of California

stomach as he was running (Appx A-II at 408-09); Garcia then fell to the ground, and petitioner approached him and stood over him to see if he had been shot while Sherrod continued shooting at Trujillo.  Petitioner "has always consistently maintained" that it was Sherrod, not he, who shot and killed Garcia.  Doc #17 at 2.

Respondent presents a different version of the crime in which the petitioner, not Sherrod, shot at the victims as they ran away.  Doc #21 at 2.  Quoting the probation officer's report, respondent asserts that, according to Trujillo, after shooting and injuring Garcia, petitioner walked up to him together with Sherrod, shot him in the stomach while standing over him and then ran away through the vacant lot.  Id; Appx A-I, Ex A at 68.  Police and rescue personnel pronounced Garcia dead at the scene of the crime. Appx A-I, Ex A at 68.  The following day, Trujillo identified petitioner as the shooter and four other witnesses interviewed at the crime scene saw petitioner and Sherrod at the location and overheard them "state they had just shot and killed the Mexican." Appx A-I, Ex A at 149.  Petitioner and Sherrod were arrested separately on August 13, 1980, and each accused the other of being the shooter who killed Garcia.  Id.

After pleading guilty and receiving his sentence, petitioner began serving fifteen years to life on April 7, 1981. Appx A-I, Ex C at 300.  He received his initial parole consideration hearing on August 14, 1990, approximately nine years into his sentence, and was denied parole.  Doc #17 at 4. Petitioner then sought and was denied parole in 1992, 1994, 1997, 1999 and 2002.  Doc #17 at 5-9.

\\

4

United States District Court
For the Northern District of California

**B**

On September 18, 2002, the Board found petitioner unsuitable for parole for a sixth time and deferred reconsideration for four years.  Appx A-I, Ex C at 320-26.  The Board's decision, which fills six pages of transcript, found that petitioner was "not suitable for parole and would pose an unreasonable risk of danger to society or a threat to public safety if released from prison," citing:  petitioner's commitment offense, petitioner's previous record, his institutional behavior, his inconclusive psychological report, his lack of realistic plans if paroled and letters and other evidence submitted in opposition to parole.  Id.

Presiding commissioner Jones Moore stated that petitioner's commitment offense was carried out in an especially cruel and callous manner because "[t]here were multiple victims attacked, injured and killed in the same incident" and the offense was "carried out in a dispassionate and calculated manner.  And the offense was carried out in a manner which demonstrates an exceptionally callous disregard for human sufferings."  Appx A-I, Ex C at 324.  In support of this finding, Moore stated that after Garcia had fallen to the ground, petitioner "stood up over the top of the victim and shot and killed him."  Id.

Moore also noted petitioner's "extensive history of criminality and misconduct," which include arrests for possession of a revolver, attempted robbery, possession of alcohol as a minor and battery, a "history of unstable and tumultuous relationships with others" and the fact that he had dropped out of high school and developed drug and alcohol problems.  Id at 324-25.
\\

United States District Court
For the Northern District of California

1    Moore found that while incarcerated, petitioner "has not

2  completed necessary programming which is essential to his

3  adjustment" and "has not developed a marketable skill or a vocation

4  at this time."  Id at 321.  At the hearing, Deputy Commissioner

5  Dennis Smith questioned petitioner about his decision to

6  discontinue Narcotics Anonymous and Alcoholics Anonymous in 1999.

7  Id at 301.

8    Moore further noted that petitioner had received two

9  write-ups for misconduct since his previous parole hearing, thus

10  failing to demonstrate "evidence of positive change," id at 321-22,

11  and had a total of thirteen CDC 115s (which are given to inmates

12  for misconduct) and twelve CDC 128s (cautionary write-ups) over the

13  course of his term of incarceration.  Appx A-I, Ex C at 323.

14  According to CDC documents in the record, petitioner's CDC 115s

15  include a stabbing assault on another inmate, conspiracy to assault

16  prison staff and disobeying direct orders.  Appx A-I, Ex A at 22.

17    Moore expressed skepticism about a somewhat optimistic

18  1999 psychological report prepared by CDC staff psychologist Dr

19  Steven Terrini because it "misstates or misquotes the facts"

20  regarding petitioner's disciplinary record by incorrectly stating

21  that petitioner had no CDC 115s.  Appx A-I, Ex C at 322.  Because

22  of this error, the commissioners did not give much weight to Dr

23  Terrini's conclusion that "[i]f released to the community

24  [petitioner's] violence potential at this time is estimated to be

25  no more than the average citizen in the community" and that

26  petitioner "is competent and responsible for his behavior."  Appx

27  A-I, Ex B at 220-23.

28  \\

United States District Court
For the Northern District of California

1    The commissioners also found that petitioner "lacks

2   realistic parole plans" because he "does not have a viable

3   residential plan * * * nor does he have acceptable employment

4   plans." Appx A-I, Ex C at 322.  Petitioner had testified that his

5   plans for parole included "work with kids and do upholstery work,

6   and just the writing" —— two plays by petitioner are included in

7   the record (Appx A-I, Ex B at 250-86) —— and possible participation

8   in his friend's film-making company.  Id at 311.

9    Moore also noted that the Los Angeles County District

10  Attorney's office and the Los Angeles Police Department had

11  submitted written opposition to a finding of parole suitability, id

12  at 322, and that a August 2002 report by "the prisoner's counselor

13  wrote on his August 2002 Board report that CCI M Morton said that

14  the prisoner poses a moderate degree of threat if released to the

15  public at this time."  Id at 323.

16   Petitioner properly exhausted his administrative remedies

17  and his habeas petitions through the state system.  See order dated

18  February 16, 2007 (Doc # 20) at 6.

19   On February 2, 2005, the superior court in Los Angeles

20  denied petitioner's habeas petition, finding that there was "some

21  evidence" that:  the crime involved multiple victims and was

22  carried out in a dispassionate and calculated manner; petitioner

23  lacked realistic parole plans and failed to participate

24  sufficiently in self-help programming; petitioner had a number of

25  disciplinary write-ups while incarcerated and the psychological

26  evaluation was inconclusive because it was based on the erroneous

27  belief that petitioner had a minimal disciplinary history.  Appx A-

28  I, Ex J at 701-03.  The superior court rejected several of the

United States District Court

For the Northern District of California

1  Board's findings as lacking evidentiary support in the record,

2  specifically that:  the crime was performed with an "exceptionally

3  callous disregard for human suffering" within the meaning of

4  California Code of Regulations title 15 § 2402(c)(1)(D); petitioner

5  had a history of "unstable or tumultuous relationships"; and

6  petitioner had a prior record of violence.  Id at 702.

7      The superior court rejected petitioner's arguments based

8  on his plea agreement, reasoning that (1) petitioner signed a plea

9  agreement that provided for an indeterminate sentence with a

10  maximum possible term of life in prison; (2) the Board was not a

11  party to the plea agreement; and (3) the Board's mandate is to

12  exercise the power to grant or deny parole with the safety of the

13  community as its foremost consideration.  Id at 704.  The superior

14  court also rejected without discussion petitioner's arguments based

15  on Penal Code § 3041, proportionality and the Board's "failure to

16  comply with the mandate that parole shall normally be given,"

17  citing In re Dannenberg, 34 Cal 4th 1061, 1095 (2005)  Id.

18      Both the California Court of Appeal, id, Ex 5, and the

19  California Supreme Court, id, Ex 6, summarily denied habeas relief.

20  On September 2, 2005, petitioner timely filed his petition in

21  federal court.

22

23      II

24      The court may entertain a petition for writ of habeas

25  corpus "in behalf of a person in custody pursuant to the judgment

26  of a State court only on the ground that he is in custody in

27  violation of the Constitution or laws or treaties of the United

28  States."  28 USC § 2254(a); Rose v Hodges, 423 US 19, 21 (1975).

United States District Court
For the Northern District of California

A state court's determination is reviewed for unreasonableness, not error.  Williams v Taylor, 529 US 362 (2000); Anderson v Alameida, 397 F3d 1175, 1179 (9th Cir 2005).  A federal court may grant habeas relief if the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the [United States] Supreme Court" or "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 USC 2254(d).

To determine whether a state court's decision is contrary to, or an unreasonable application of, clearly established federal law, this court must look to the highest state court to address the merits of petitioner's claim in a reasoned decision.  LaJoie v Thompson, 217 F3d 663, 669 n7 (9th Cir 2000).  If state appellate courts summarily deny a petitioner's claim, a federal court must "look through" the summary disposition to the last reasoned opinion.  Shackleford v Hubbard, 234 F3d 1072, 1079 n2 (9th Cir 2000) (citing Ylst v Nunnemaker, 501 US 797, 803-4 (1991)).  Here, the opinion the court must examine through AEDPA's lens is that of the superior court.

California prisoners have a cognizable liberty interest in being granted parole, as noted in the court's order to show cause dated July 5, 2006.  Doc #11.  A habeas petition from a state prisoner challenging the denial of parole is cognizable under § 2254(d).  Sass v California Board of Prison Terms, 461 F3d 1123, 1126-28 (9th Cir 2006).  The Ninth Circuit recently discussed prisoners' liberty interest in parole in Irons v Carey, 2007 WL 2027359, *3 (July 13, 2007, ptn for reh'g denied November 6, 2007):

United States District Court
For the Northern District of California

1  "California Penal Code section 3041 vests Irons and all other

2  California prisoners whose sentence provides for a possibility of

3  parole with a constitutionally protected liberty interest in the

4  receipt of a parole release date, a liberty interest that is

5  protected by the procedural safeguards of the Due Process Clause."

6  See also <u>Board of Pardons v Allen</u>, 482 US 369, 381 (1987)(Montana's

7  parole statute confers on state prisoners a liberty interest in

8  parole release that is protected under Due Process Clause of

9  Fourteenth Amendment); accord, <u>Greenholtz v Inmates of Nebraska</u>

10 <u>Penal and Correctional Complex</u>, 442 US 1, 7 (1979); <u>Sass</u>, 461 F3d

11 at 1128; <u>McQuillion v Duncan</u>, 306 F3d 895, 900 (9th Cir 2002).

12       A parole board, in order to satisfy due process, must

13 rely on "some evidence in the record" when denying a prisoner

14 parole.  See <u>Irons</u>, 2007 WL 2027359 at *3.  "To determine whether

15 the some evidence standard is met 'does not require examination of

16 the entire record, independent assessment of the credibility of

17 witnesses, or weighing of the evidence.  Instead, the relevant

18 question is whether there is any evidence in the record that could

19 support the conclusion reached by the disciplinary board.'"  <u>Sass</u>,

20 461 F3d at 1128 (quoting <u>Superintendent, Massachusetts Correctional</u>

21 <u>Institution at Walpole v Hill</u>, 472 US 445, 454 (1984)).  The "some

22 evidence standard is minimal" and its purpose is to ensure that

23 "the record is not so devoid of evidence that the findings of the

24 [parole board] were without support or arbitrary."  Id at 1129.

25 The evidence relied upon by the board must have "some indicia of

26 reliability."  <u>McQuillion</u>, 306 F3d at 904; <u>Jancsek v Oregon Board</u>

27 <u>of Parole</u>, 833 F2d 1389, 1390 (9th Cir 1987).

28 \\

1    Respondent urges the court not to apply the "some

2  evidence" standard, arguing that while the Ninth Circuit in Sass

3  extended the Supreme Court's "some evidence" test to the parole

4  context, the Supreme Court has never actually held that a state

5  parole hearing must be supported by some evidence, so this standard

6  cannot form the basis for federal habeas review under AEDPA.  Doc #

7  21 at 9-10.  While respondent's argument possesses a certain

8  abstract logic, this district court has no practical alternative

9  but to apply Ninth Circuit rules in habeas cases unless and until

10  the Supreme Court establishes new and different ones.  Irons,

11  meanwhile, is unequivocal in articulating the applicable Supreme

12  Court rule in such cases:  "[a]t the time that Irons's state habeas

13  petition was before the state courts, the Supreme Court had clearly

14  established that a parole board's decision deprives a prisoner of

15  due process with respect to this interest if the board's decision

16  is not supported by 'some evidence in the record.'" 2007 WL

17  2027359, *3.

18    When applying the some evidence standard, the court must

19  look to the California statute codifying the factors for parole

20  boards to use when granting or denying parole.  Id.  California

21  Penal Code § 3041(b) (West 2005) provides that the parole panel or

22  board:

23        shall set a release date unless it determines that
            the gravity of the current convicted offense or
24        offenses, or the timing and gravity of current or
            past convicted offense or offenses, is such that
25        consideration of the public safety requires a more
            lengthy period of incarceration for this individual,
26        and that a parole date, therefore, cannot be fixed
            at this meeting.

27

28  The implementing regulations for section 3041(b) provide the Board

United States District Court
For the Northern District of California

with the factors to consider in determining whether an inmate convicted of murder is suitable for parole.  See 15 Cal Code Regs §§ 2400-11.  Section 2402(a), which sets forth the criteria for determining suitability for parole, unequivocally states that "[r]egardless of the length of time served, a life prisoner shall be found unsuitable for and denied parole if in the judgment of the panel the prisoner will pose an unreasonable risk of danger to society if released from prison."

Factors tending to show "unsuitability" for parole are as follows:

> (1) Commitment Offense.  The prisoner committed the offense in an especially heinous, atrocious or cruel manner.  The factors to be considered include:
>
> > (A) Multiple victims were attacked, injured or killed in the same or separate incidents.
> >
> > (B) The offense was carried out in a dispassionate and calculated manner, such as an execution-style murder.
> >
> > (C) The victim was abused, defiled or mutilated during or after the offense.
> >
> > (D) The offense was carried out in a manner which demonstrates an exceptionally callous disregard for human suffering.
> >
> > (E) The motive for the crime is inexplicable or very trivial in relation to the offense.
>
> (2) Previous Record of Violence.  The prisoner on previous occasions inflicted or attempted to inflict serious injury on a victim, particularly if the prisoner demonstrated serious assaultive behavior at an early age.
>
> (3) Unstable Social History.  The prisoner has a history of unstable or tumultuous relationships with others.
>
> (4) Sadistic Sexual Offenses.  The prisoner has previously sexually assaulted another in a manner calculated to inflict unusual pain or fear upon the victim.

(5) Psychological Factors.  The prisoner has a lengthy history of severe mental problems related to the offense.

(6) Institutional Behavior.  The prisoner has engaged in serious misconduct in prison or jail.

15 Cal Code of Regulations § 2402(c) (2007).

Factors favoring a finding of "suitability" include:

(1) No Juvenile Record.  The prisoner does not have a record of assaulting others as a juvenile or committing crimes with a potential of personal harm to victims.

(2) Stable Social History.  The prisoner has experienced reasonably stable relationships with others.

(3) Signs of Remorse.  The prisoner performed acts which tend to indicate the presence of remorse, such as attempting to repair the damage, seeking help for or relieving suffering of the victim, or indicating that he understands the nature and magnitude of the offense.

(4) Motivation for Crime.  The prisoner committed his crime as the result of significant stress in his life, especially if the stress has built over a long period of time.

(5) Battered Women Syndrome.  At the time of the commission of the crime, the prisoner suffered from Battered Women Syndrome, as defined in section 2000(b), and it appears the criminal behavior was the result of that victimization.

(6) Lack of Criminal History.  The prisoner lacks any significant history of violent crime.

(7) Age.  The prisoner's present age reduces the probability of recidivism.

(8) Understanding and Plans for Future.  The prisoner has made realistic plans for release or has developed marketable skills that can be put to use upon release.

(9) Institutional Behavior.  Institutional activities indicate an enhanced ability to function within the law upon release.

15 Cal Code of Regulations § 2402(d) (2007).

13

United States District Court
For the Northern District of California

III

Petitioner's primary claim is that the Board lacked sufficient evidence upon which it could lawfully have relied in denying him parole.  See Doc #16 at 21-22; Doc #17 at 16-46. Petitioner, however, has failed to meet his burden under the above-cited authorities.

Petitioner argues that the Board's continued reliance on his commitment offense violates his due process rights.  Doc #17 at 26-41.  In Irons v Carey, the court recognized that "indefinite detention based solely on an inmate's commitment offense, regardless of the extent of his rehabilitation, will at some point violate due process * * *."  2007 WL 2027359 at *6.  Sass, 461 F3d at 1129.  Petitioner's, however, is not such a case.

California law provides specifically for the commitment offense to be one factor considered by the Board.  See Cal Penal Code § 3041(b) (West 2005); 15 Cal Code of Regulations § 2402(c)(1) (2007).  The California Supreme Court recently reaffirmed the permissibility of relying on the commitment offense.  In re Dannenberg, 34 Cal 4th 1061, 1095 (2005).  The Ninth Circuit held in Irons that "[the] commitment offense, standing alone, is a sufficient basis for deeming a petitioner unsuitable where, as here, there is some evidence to support a finding that [the crime fell within the ambit of the standards set forth in 15 California Code of Regulations § 2402(c)]".  2007 WL 2027359 at *5.

The Board found that the crime involved multiple victims, a factor properly considered under 15 California Code of Regulations § 2402(c)(1)(A).  Appx A-I, Ex C at 324.  "Some \\

14

evidence" supports this finding:  victim Trujillo identified petitioner as the shooter and four witnesses who were at the scene identified petitioner as a participant in the crime.  Appx A-I, Ex A at 149.  Furthermore, petitioner admitted that it was he who asked the victims for money and fired the initial shot.  Appx A-I, Ex A at 175; Appx A-II at 406, 644.

There is also some evidence that petitioner carried out the crime in a dispassionate and calculated manner, namely, eyewitness testimony that petitioner stood over Garcia and shot him while he lay injured on the ground.  Id.  Petitioner argues, erroneously, that as a matter of law the Board cannot find that a homicide in the second degree was carried out in a dispassionate and calculated manner.  Doc #16 at 17-18; Doc #17 at 30-31.  This factor is to be considered pursuant to 15 California Code of Regulations § 2402(c)(1)(B).  Because this is a considered factor, the parole board's finding must be upheld if it is supported by some evidence.  Furthermore, in Dannenberg, 34 Cal 4th at 1095, the California Supreme Court recognized that the Board could properly consider factors beyond the minimum elements of second degree murder.  See also Irons, 2007 WL 2027359 at *4.  The court in Dannenberg upheld the Board's denial of parole that "pointed to circumstances of the inmate's offense suggesting viciousness beyond the minimum elements of second degree murder * * *."  Dannenberg, 34 Cal 4th at 1095.  Unquestionably, "some evidence" supports the Board's finding that petitioner carried out the crime in a dispassionate and calculated manner.

Petitioner's primary contention —— that it is impermissible to rely solely on the commitment offense to deny

15

United States District Court
For the Northern District of California

parole —— fails because the Board's denial did not rely solely on
the commitment offense.  Furthermore, the cases that petitioner
cites in support of his argument involve prisoners who have
exhibited exemplary institutional behavior and are not analogous to
petitioner's case.  Doc #17 at 34-40.  For example, in <u>Rosenkrantz
v Marshall</u>, 444 F Supp 2d 1063, 1073 (ND Cal 2006), cited by
petitioner at Doc #17 at 35, petitioner Rosenkrantz had no
disciplinary record while in prison and was a stellar inmate in all
respects.  The same is true of the habeas petitioner in <u>In re
Scott</u>, 133 Cal App 4th 573, 582 (2005), also cited by petitioner.
Doc #17 at 37.  Petitioner also relies upon <u>Irons v Warden</u>, 358 F
Supp 2d 936 (ED Cal 2005)(Doc #17 at 39), but this case was since
reversed by <u>Irons v Carey</u>, 2007 WL 2027359; moreover, Irons had
exhibited model behavior in prison, yet the court upheld the
Board's denial of parole based solely on his commitment offense.
2007 WL 2027359 *2, *5.  Petitioner's reliance on these authorities
is therefore unavailing.  The superior court's opinion upholding
the Board's findings regarding petitioner's commitment offense
therefore was not contrary to, or an unreasonable application of,
federal law or based on an unreasonable determination of the facts.

          In denying parole, the Board also relied, in part, on
petitioner's disciplinary record while incarcerated.  Appx A-I, Ex
C at 31-32.  Petitioner asserts that he had a "transition" period
upon entering prison and that "he has had no disciplinaries
resulting from any physical altercation within the past eighteen
(18) years."  Doc #16 at 14; Doc #17 at 26.  But the Board's
reliance on the fact that petitioner received a total of thirteen
CDC 115s and twelve CDC 128s while incarcerated, while receiving

only one "laudatory chrono" dated January 29, 1988 constitutes "some evidence" supporting the denial.  Appx A-I, Ex C at 323; Appx A-I, Ex A at 23.  Petitioner most recently received a CDC 128 in January 2000 for being absent from assignment, as well as a CDC 115 in November 1999 for disobeying a direct order.  Appx A-I, Ex C at 322.  His CDC 115s also include a stabbing assault on another inmate, conspiracy to assault prison staff and disobeying direct orders.  Appx A-I, Ex A at 20-22.  The Board is required to consider serious institutional misconduct when deciding whether a prisoner is suitable for parole and properly did so here.  See 15 Cal Code of Regulations § 2402(c)(6).

In addition, the record supports the Board's finding, discussed above, that CDC staff psychologist Dr Terrini's psychological evaluation of petitioner's propensity for violence if released was inconclusive because it was based on an erroneous premise.  Appx A-I, Ex C at 322.  The Board's rejection of Dr Terrini's projection of petitioner's violence potential if released is therefore supported by some evidence in the record.

The superior court's ruling upholding the Board's findings regarding petitioner's disciplinary record and the Terrini report therefore was not contrary to, or an unreasonable application of, federal law or based on an unreasonable determination of the facts.

The Board's finding that petitioner has not sufficiently participated in self-help and therapy programming, see id, Ex C at 321, is supported by "some evidence."  Petitioner admits that he has not participated in Narcotics Anonymous or Alcoholics Anonymous since 1999, see id at 301, despite the comment in Terrini's 1999

United States District Court
For the Northern District of California

17

United States District Court
For the Northern District of California

1  evaluation that "[t]he most significant risk factor for this man

2  would be continued abuse of alcohol."  See id, Ex B at 223.

3  Terrini further recommended that if parole were granted, petitioner

4  should abstain from all alcohol and drug use, submit to monitoring

5  and be required to attend self-help groups such as Alcoholics

6  Anonymous.  Id.  Accordingly, petitioner's documented failure to

7  participate sufficiently in self-help programming constitutes some

8  evidence that the Board lawfully relied on in denying parole.  The

9  superior court's opinion upholding the Board's findings regarding

10  petitioner's failure to participate in sufficient self-help

11  programming therefore was not contrary to, or an unreasonable

12  application of, federal law or based on an unreasonable

13  determination of the facts.

14       Given this body of evidence supporting the Board's denial

15  of parole, it is unnecessary to delve into the other factors listed

16  by the Board, such as petitioner's lack of realistic parole and

17  employment plans.  See Biggs, 334 F3d at 916 (holding that "the

18  district court was correct in finding that in spite of the fact

19  that several of the Board's findings were unsupported, there was

20  some evidence supporting the Board's decision that Biggs is not

21  entitled to relief at this time"); Sass, 461 F3d at 1128 ("the

22  relevant question [in determining whether the some evidence

23  standard is met] is whether there is any evidence in the record

24  that could support the conclusion reached by the disciplinary

25  board").  The Board, while recognizing some of petitioner's

26  laudable strides toward self-improvement, ultimately concluded that

27  the "positive aspects of [petitioner's] behavior don't outweigh the

28  factors of unsuitability at this time."  Id, Ex C at 323-24.  The

United States District Court

For the Northern District of California

superior court upheld that decision and this court has no basis for disturbing the state court's determination that the Board's decision meets the "some evidence" standard.


IV

Petitioner also makes several legal arguments in support of his petition.  The court will address each in turn.


A

Petitioner asserts that he is entitled to parole pursuant to his plea agreement.  See Doc #16 at 19-20; Doc #17 at 47-53. Specifically, petitioner argues that the Board has turned his negotiated plea of second degree murder into a first degree murder charge by continuing to deny him parole.  Id.  This argument is without merit.

Under California law, plea agreements are subject to the ordinary rules of contract interpretation.  See Buckley v Terhune, 441 F3d 688, 694-95 (9th Cir 2006); Brown v Poole, 337 F3d 1155, 1159 (9th Cir 2003).  California courts are to look first to the plain meaning of the agreement.  See Cal Civil Code §§ 1638, 1644. Petitioner pled guilty to second degree murder and the plea agreement he struck with the government set forth a term of punishment of fifteen years to life, with a two-year enhancement for the use of a firearm during the commission of a crime.  See Appx A-I, Ex A at 97.  Petitioner has not identified any provision in the plea agreement or any promises made by the government entitling him to be released at a determinate time.
\\

19

United States District Court
For the Northern District of California

1    Petitioner voluntarily entered into a plea agreement with
2  the government with the understanding that he might spend the rest
3  of his life in prison.  The superior court's determination that the
4  Board's decision to deny petitioner's parole was consistent with
5  its primary mandate to protect the safety of the community was
6  consistent with Irons and Sass and will therefore not be disturbed
7  by this court.

8

9                                    B

10    Petitioner alleges that former Governor Gray Davis had an
11  informal "no parole" policy for "virtually all prisoners convicted
12  of murder" and that the Board, in contravention of California Penal
13  Code § 3041's mandate that the board "shall normally set" parole,
14  followed this policy in his case.  See Doc #17 at 53-68; Doc #16 at
15  24-26.  Petitioner further argues that this alleged policy is
16  arbitrary and capricious and, as a result, violates his due process
17  rights, equal protection rights and his right to be free from cruel
18  and unusual punishment.  Id.  While petitioner argues this point at
19  length and submits a voluminous record in support of his argument,
20  the court is unpersuaded.

21    The California Supreme Court considered a similar
22  contention in In re Rosenkrantz, 29 Cal 4th 616, 685-86 (2002) and
23  held that Governor Davis's reversal of most of the Board's
24  decisions to grant parole did not constitute evidence of a blanket
25  no-parole policy warranting reversal in a specific case where
26  denial was supported by a written decision detailing the factors
27  and evidence supporting the decision.
28  \\

United States District Court
For the Northern District of California

Although the <u>Rosenkrantz</u> decision did not directly address petitioner's contention that the Board itself is carrying out a policy of denying parole across the board, it implicitly finds the point without merit because it recognizes that the Board recommends parole in more cases than the governor approves:

> Petitioner has not presented any evidence establishing that the Governor's actual decisions reversing grants of parole by the Board failed to engage in an individualized consideration of the factors concerning parole suitability, or that the decisions themselves reflected or relied upon any blanket policy of denying parole to all murderers. The circumstance that the Governor has reversed most of the Board's decisions granting parole does not establish that he follows a blanket policy of denying parole or that his decision in the present case was based upon such a policy, rather than upon a consideration of the factors and evidence discussed in the Governor's lengthy written decision denying petitioner parole. Such reversals simply may indicate that the Governor is more stringent or cautious than the Board in evaluating the circumstances of a particular offense and the relative risk to public safety that may be posed by the release of a particular individual.

29 Cal 4th at 682.

Also of relevance here, the United States Supreme Court held in <u>California Department of Corrections v Morales</u>, 514 US 499 (1995), that an amendment to California's parole statute did not violate the Ex Post Facto Clause when applied to individuals sentenced before the amendment because of California's use of "particularized findings" combined with the Board's broad discretion under the statute.

Petitioner effectively asks the court to overrule <u>In re Rosenkrantz</u>, asserting that "an unlawful policy does in fact exist" under which "it routinely violates due process by summarily denying parole without meaningful review of the facts."  Doc # 17 at 61,

United States District Court
For the Northern District of California

63.   The court declines to delve into the matters of state-wide policy that petitioner seeks to introduce in support of his petition because the record demonstrates that the Board conducted a particularized review of the facts in petitioner's case and rendered a decision that was supported by "some evidence" as the Constitution requires.

In the instant case, the Board made an individualized decision, supported by not merely "some," but ample evidence in the record, that petitioner would constitute an unreasonable risk of danger to society if paroled.  Accordingly, the superior court did not unreasonably apply federal law or make an unreasonable determination of the facts in ruling against petitioner on this issue.

C

Petitioner also argues that the Board was required to consider the proportionality of the term he has served in comparison to other prisoners convicted of second-degree murder. The court notes that this issue was adjudicated by the California Supreme Court in In re Dannenberg, which explicitly reversed In Re Ramirez, 94 Cal App 4th 549 (2001), upon which petitioner relies throughout much of his brief.  In Dannenberg, the court explained:

> When the time comes to evaluate the individual life inmate's suitability for release on parole, the BPT is authorized — indeed, required — to eschew term uniformity, based simply on similar punishment for similar crimes, in the interest of public safety in the particular case.  Under this "hybrid" sentencing scheme * * *, an inmate whose offense was so serious as to warrant, at the outset, a maximum term of life in prison, may be denied parole during whatever time the Board deems required for "this individual" by "consideration of the public safety." * * *

United States District Court
For the Northern District of California

1
2
3
4

> So long as the Board's finding of unsuitability flows
> from pertinent criteria, and is supported by "some
> evidence" in the record before the Board * * *, the
> overriding statutory concern for public safety in the
> individual case trumps any expectancy the
> indeterminate life inmate may have in a term of
> comparative equality with those served by other
> similar offenders.

5

6  34 Cal 4th 1061, 1076.  The Ninth Circuit agreed with <u>Dannenberg</u> in

7  <u>Sass</u>, 461 F3d at 1127-28.  Therefore, it cannot be said that the

8  superior court unreasonably applied federal law in relying on

9  <u>Dannenberg</u> to rule against petitioner on this issue.

10

11                                    V

12      For the reasons stated herein, the petition for a writ of

13  habeas corpus is DENIED.  The clerk is directed to close file

14  number C 05-3564 and terminate any pending motions.

15

16      IT IS SO ORDERED.

17

18  _____
    VAUGHN R WALKER
19  United States District Chief Judge

20
21
22
23
24
25
26
27
28

23